UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RICHARDS, et al., <br><br>      Plaintiffs, <br><br>   v. <br><br> DEPARTMENT OF BUILDING INSPECTION OF THE CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br>      Defendants. | Case No.  20-cv-01242-JCS <br><br> **ORDER REGARDING MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY** <br><br> Re: Dkt. Nos. 80, 81 |

## I.      INTRODUCTION

Plaintiffs Dennis Richards, Rachel Swann, and Six Dogs LLC assert that Defendants the City and County of San Francisco ("San Francisco" or the "City"), the San Francisco Department of Building Inspection ("DBI"), and DBI employees Edward Sweeney and Mauricio Hernandez retaliated against Plaintiffs, including by canceling permits for renovations of a building Plaintiffs owned, based on Richards's protected speech as a member of the San Francisco Planning Commission criticizing perceived corruption at DBI.  Defendants move for summary judgment and to exclude the opinions of Plaintiffs' damages expert.  The Court held a hearing on November 5, 2021.

For the reasons discussed below, Defendants' motion for summary judgment is DENIED as to Plaintiffs' claim for First Amendment retaliation related to the permit revocations. Defendants' motion is GRANTED as to Swann's claims under the Fourth and Fourteenth Amendments, which Plaintiffs have declined to pursue, and as to her First Amendment claim to the extent it is based on any purportedly retaliatory acts besides the revocation of Six Dogs' permits (and conduct directly related to the revocations), since Plaintiffs have not presented evidence regarding other conduct, like the alleged burglary of Swann's office.  The Court declines

to exercise supplemental jurisdiction over Swann's trespass claim, which is not meaningfully related to the surviving federal claim, and therefore DISMISSES the trespass claim without prejudice to Swann pursuing it in state court. Defendants' motion to exclude expert testimony is GRANTED in part and DENIED in part.[1]

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Background

#### 1.    Factual Overview

This summary, which focuses on the facts relevant to the outcome of the present motion, is included for the convenience of the reader and is not intended as a complete recitation of the evidentiary record. Since reasonable inferences and disputed issues of fact are resolved in favor of the non-movant on summary judgment, this section presents the facts generally in a light favorable to Plaintiffs. Nothing in this order should be construed as resolving any disputed issue of fact.

Plaintiff Richards served on the San Francisco Planning Commission from 2014 to 2019. Richards Decl. (dkt. 91-31) ¶ 5. He became concerned that certain members of the building industry, including non-parties John Pollard and Rodrigo Santos, routinely submitted fraudulent permit applications that misrepresented existing conditions and the scope of planned work, knowing they would suffer minimal consequences if they were caught. *Id.* ¶¶ 6–7. Richards believed that DBI was turning a blind eye to these violations and interpreting the San Francisco Building Code in a manner that he considered untenable, and he demanded explanations from DBI. *Id.* ¶ 8. Richards vocally advocated for requiring delinquent builders to restore properties to their original condition to deter the practice of intentionally exceeding the scope of permits and seeking forgiveness if necessary, and the Planning Commission took that course in a number of cases of permit violations. *Id.* ¶¶ 9–14.

Richards was aware that the Residential Builders Association ("RBA"), which had political clout, felt threatened by his approach to permit violations. *See id.* ¶¶ 14–18. Some portions of Richards's declaration on this subject are inadmissible hearsay, particularly his

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

recollection of what Planning Commissioner Joel Koppel told Richards about what Defendant Edward Sweeney told Koppel, Richards Decl. ¶ 15, but there remains evidence of the RBA's influence and opposition to Richards's approach even if those portions are excluded.  For example, Richards states that RBA president Sean Keighran told him that his approach would "ruin [Keighran's] industry," *id.* ¶ 18, which is not hearsay because it is not offered to show Keighran's state of mind rather than for the truth of Keighran's statement.

On July 18, 2019,[2] Richards "grilled DBI official Bernie Curran"[3] regarding DBI's failure to identify violations at a project on 18th Street that Pollard was involved with, noting that DBI had thoroughly inspected similar work on a project where Richards was an investor.  *Id.* ¶ 17.

Richards is an investor in Plaintiff Six Dogs, which owned residential property on 22nd Street in San Francisco (the "Six Dogs Property") that was undergoing renovations.[4]  *See* Richards Decl. ¶ 20.  Before the events at issue, the ongoing work at the Six Dogs Property had been subject to multiple inspections by DBI and other authorities, which identified no violations. Buscovich Decl. (dkt. 91-1) ¶ 5.  On September 27, 2019, the engineer for the project, Pat Buscovich, told Richards that someone had filed an anonymous complaint to DBI about the Six Dogs Property.  *Id.* ¶ 5; Richards Decl. ¶ 23.  Buscovich met that day with Defendant Mauricio Hernandez, DBI's Chief Building Inspector, for an inspection,[5] and Hernandez told him he intended to revoke nine permits for the project, which aroused Buscovich's suspicion.  Buscovich Decl. ¶ 6.  Hernandez issued an inspection report documenting a number of a violations.  Stevens Decl. (dkt. 81-1) Ex. N.  Buscovich believed that to the extent the violations were well founded,

---

[2] Richards asserts that this incident occurred on August 29, 2019, Richards Decl. ¶ 18, but Defendants have offered a video of the hearing on that date that does not include testimony by Curran, Stevens Decl. Ex. I.  Curran appeared at a hearing on July 18, 2019 where Richards asked him a series of questions that could be construed as critical of DBI's and Curran's oversight of the 18th Street project, although he did not explicitly accuse DBI of misconduct.  Stevens Decl. Ex. H at 28:35–38:20, 43:30–48:00.

[3] Curran has since been criminally charged with honest services wire fraud and asserted his Fifth Amendment right against self-incrimination when deposed in this case.

[4] Plaintiffs allege that Plaintiff Rachel Swann is also an owner of Six Dogs, FAC ¶ 12, but it is not clear there is evidentiary support for that proposition in the current record.  The Court need not resolve that issue as Defendants have not moved for summary judgment on that basis.

[5] The parties dispute whether it was a deviation from normal procedure for Hernandez to handle the complaint and conduct the inspection.  The Court declines to resolve that issue, which is not material to the outcome of the present motion.

they were minor and should be correctable with a revision permit.  Buscovich Decl. ¶ 11; *see* Richards Decl. ¶ 23.

At Richards's direction, Buscovich and contractor Hector Lopez[6] met with Hernandez and Defendant Edward Sweeney, who was then DBI's Deputy Director, on Monday, September 30, 2019, after Hernandez issued a notice of violation earlier that day calling for Six Dogs to stop work on the property.  Buscovich Decl. ¶ 7; Richards Decl. ¶ 23; Stevens Decl. Ex. O (notice of violation).  According to Hernandez and Sweeney, Buscovich said that the property belonged to Richards and Swann, and that he would not accept a notice of violation or cooperate beyond paying additional money.  Stevens Decl. Ex. L (Hernandez Dep.) at 53:22–54:12; Emblidge Decl. (dkt. 91-6) Ex. D (Sweeney Dep. I) at 32:4–16.  Sweeney and Hernandez said that they were revoking the permits for the Six Dogs Property.  Buscovich Decl. ¶ 13.  They testified that the revocation was based on Buscovich's purported unwillingness to cooperate in remediating the violations.  Emblidge Decl. Ex. D (Sweeney Dep. I) at 32:20–24.  Hernandez testified that he did not believe he knew Richards owned the property before this meeting, and that he was not aware of Richards making "critical remarks about the building department" until the much later Board of Appeals hearing on the permit revocations.  Stevens Decl. Ex. L (Hernandez Dep.) at 40:7–16, 49:10–14.

Buscovich and Lopez dispute that characterization of the meeting, stating in declarations that Buscovich tried to discuss the issues DBI had identified and never indicated that he would not comply, but Sweeney and Hernandez would not let him speak and said they were revoking the permits based on the nature of the violations.  Buscovich Decl. ¶¶ 11–12; Lopez Decl. ¶¶ 5–6.  According to Buscovich, Sweeney told him at the end of the meeting "words to the effect of that he wanted to make sure [Buscovich] knew how much he would enjoy screwing with [Buscovich] as a bonus secondary target to Mr. Richards," and "went on about screwing [Buscovich] as payback because [Buscovich] had complained about DBI's treatment of Rodrigo Santos."

---

[6] Lopez is sometimes referenced in the record as "Hector Hernandez."  This order uses the name under which he signed his declaration.  All references herein to "Hernandez" refer to Defendant Mauricio Hernandez.

United States District Court
Northern District of California

United States District Court
Northern District of California

Buscovich Decl. ¶ 14.

There is evidence suggesting that the complaint about the Six Dogs Property originated with Santos, who is currently facing criminal charges for bank fraud and identity theft and invoked his Fifth Amendment right against self-incrimination when deposed in this case.  Sweeney testified that Santos approached him about filing a complaint regarding Richards having work done outside the scope of his building permits, on the condition that Sweeney would keep Santos anonymous as the source of the complaint.  Emblidge Decl. Ex. D (Sweeney Dep. I) at 13:8–24.  Sweeney saw Santos again a week a later and Santos said he was not ready to file the complaint.  *Id.* at 13:24–25.

On September 25, 2019, a week after Sweeney's second conversation with Santos, another person called Sweeney to make a complaint about the Six Dogs Property, providing Sweeney with the address for the first time.  *Id.* at 13:25–14:11.  While Sweeney did not know who that person was, he believed he was affiliated with Santos because the subject matter was the same as what Santos had discussed with Sweeney and the caller specifically identified Richards as involved with the project.  *Id.* at 15:8–14.  A number of senior DBI officials were out of the office at the time, so, according to Sweeney's testimony, Sweeney approached Patrick O'Riordan, who said he was leaving the next day for Ireland.  *Id.* at 14:11–17.  Sweeney testified that Hernandez, who was in O'Riordan's office at the time, said the he could handle the complaint.  *Id.* at 14:17–20.  Hernandez's version differs somewhat: he testified that Sweeney "brought [Hernandez] into . . . [Sweeney's] office and said we have a complaint about this property can you check and investigate because we don't have anybody else and it involves one of our inspectors."  Stevens Decl. Ex. L (Hernandez Dep.) at 41:4–9.  O'Riordan testified that he was in Barcelona at the time the complaint came in, and Sweeney therefore did not come to him about it.  Emblidge Decl. Ex. C (O'Riordan Dep.) at 43:12–44:13; *see also id.* at 63:4–64:8.

Sweeney also testified that when he by chance encountered Darryl Honda, a member of the Board of Appeals and a friend of Richards, he told Honda that he "might want to call [Richards] because if it was just a couple of small permits then [Santos] was overblowing it and [Sweeney] would rather [Richards] just go get a permit and take care of it."  Emblidge Decl. Ex. D (Sweeney

5

United States District Court
Northern District of California

Dep. I) at 20:23–21:5, 24:2–4.  Honda texted Richards on September 27, 2019, "Hey bro, there's some not so nice stuff going around about you right now.  What's up[?]"  Stevens Decl. Ex. V.  Honda's deposition testimony introduced some discrepancies as to when and how he heard about Richards's permit issues, but they are not material to the outcome of the present motion.  *See generally* Emblidge Decl. Ex. N (Honda Dep. and exhibits thereto).  Honda testified that in conversations with building professionals and oversight officials at an RBA golf tournament, people were talking about Richards's purported hypocrisy in committing the same sort of permitting violations that he was stringent about enforcing.  *See id.* at 121:16–122:3.

Sweeney testified that at some point before the formal complaint was made, he mentioned during a "senior staff meeting" that he had gotten an anonymous complaint about a project Richards was involved with but did not yet have the address.  Emblidge Decl. Ex. D (Sweeney Dep. I) at 25:9–18.  Sweeney believed the complaint was worth discussing at that meeting because Richards was on the Planning Commission.  *Id.* at 26:11–14.  Sweeney testified that Hernandez, Curran, and O'Riordan, among others, were present at that meeting.  *Id.* at 25:25–26:5.  According to Sweeney, in accordance with DBI's usual procedure for anonymous complaints, he did not reveal that Santos was the source of the complaint.  Emblidge Decl. Ex. E (Sweeney Dep. II) at 98:25–99:11.

In the days surrounding the September 25, 2019 complaint and Hernandez's September 27, 2019 inspection of the Six Dogs Property, Sweeney had a number of telephone calls with Bernard Curran, RBA president Sean Keighran (who had told Richards that his approach to oversight would ruin Keighran's industry), and Sweeney's friend John Pollard (who had worked on the 18th Street project that Richards had criticized in public hearings), among others, all of whom Sweeney spoke with regularly.  *See id.* at 102:7–105:13.  Sweeney could not recall the subject of those phone calls at his deposition and acknowledged that it was possible at least some of them might have pertained to Richards and the Six Dogs Property.  *See, e.g.*, *id.* at 102:21–103:1.

Sweeney admits that he allowed Santos and his associate Kirsten Urrutia to copy plans for the Six Dogs Property in violation of DBI policy.  Emblidge Decl. Ex. D (Sweeney Dep. I) at 45:1–46:13.  Sweeney states that he did so because he was interested in Santos's view of whether

6

the foundation plans were sufficient, since he was concerned that DBI engineers might not "go against one of their own" and criticize Buscovich's work, although he acknowledged that he had not shared copies of plans with complainants in other cases. *Id.* at 46:18–48:11. Plaintiffs contend that the record supports an inference that Sweeney misstated the timing of when he allowed Santos and Urrutia to make copies, and that it actually occurred on September 23, 2019, before the anonymous complaint was filed, when Urrutia states that she visited DBI to look at the plans. *See* Emblidge Decl. Ex. F (Urrutia Dep.) at 35:17–36:3. The Court need not resolve that dispute for the purpose of the present motion.

After DBI revoked Six Dogs' permits, the San Francisco Planning Department conducted its own inspection on November 14, 2019 and found a number of violations, which would have led to a request to suspend the permits if DBI had not already revoked them. *See* Wong Decl. (dkt. 81-35) ¶¶ 7–12. After a long process including multiple revisions to plans, Six Dogs eventually in 2021 abated all violations identified by the Planning Department. *Id.* ¶¶ 11, 13

### 2.    Procedural History

Six Dogs and its engineer Pat Buscovich each filed an appeal to the San Francisco Board of Appeals on October 15, 2019, asserting that DBI had no lawful basis for revoking any of the permits, that DBI had never revoked permits for similar minor alleged violations in the past, and that DBI revoked Six Dogs' permits in order to retaliate against Six Dogs' owners' speech regarding perceived corruption and favoritism at DBI. Request for Judicial Notice in Support of Mot. to Dismiss (dkt. 14) Ex. A. Six Dogs asked the Board of Appeals to rescind the revocations and all stop work orders, reinstate the permits, and "rescind any penalties, reassessments or fines arising out of the revocation letter or associated Notices of Violations." *Id.*

At a meeting on December 4, 2019, the Board of Appeals voted to continue the matter to March 18, 2020 "so that the project sponsor can: (1) meet with the appropriate departments to resolve the issues that were identified at the hearing, and (2) provide a complete and full set of plans." *Id.* Ex. B. The hearing was further continued to May 6, 2020 based on the COVID-19 public health emergency. *See id.* ¶¶ 3–4 & Ex. C.

On May 22, 2020, the Board of Appeals issued the following identical decision in each

appel:

> **PURSUANT TO** § 4.106 of the Charter of the City & County of San Francisco and Article 1, §14 of the Business & Tax Regulations Code of the said City & County, and the action above stated, the Board of Appeals hereby **GRANTS THE APPEAL AND ORDERS** that the REVOCATION REQUEST by the Department of Building Inspection is OVERTURNED so that these permits can be reinstated and on the CONDITION that the permit holder cancel these permits within thirty (30) days of the release of this decision, on the basis that this represents the agreement of the parties.

Stevens Decl. Ex. U.

While the administrative appeal was pending, Plaintiffs filed this action on February 19, 2020, and filed their operative first amended complaint on March 26, 2020.  That complaint asserts the following claims: (1) a claim by all Plaintiffs under 42 U.S.C. § 1983 against Sweeney and Hernandez for violation of Richards's right to free speech under the First Amendment, 1st Am. Compl. (dkt. 9) ¶¶ 41–47; (2) a claim by Swann for trespass under California law against the City, *id.* ¶¶ 48–60; (3) a claim by Swann under § 1983 against Sweeney and Hernandez for violation of her rights under the Fourth and Fourteenth Amendments when a San Francisco Fire Department employee entered property that Swann owned without permission or a warrant, *id.* ¶¶ 61–76; and (4) a claim by all Plaintiffs against all Defendants for intentional infliction of emotional distress under California law, *id.* ¶¶ 77–82.

On Defendants' motion to dismiss, the Court declined to dismiss Plaintiffs' federal claims under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), because the administrative proceedings on which Defendants based that argument had concluded before the motion was decided, Order re Mot. to Dismiss (dkt. 32) at 8–10, and held that the state law immunity doctrines on which Defendants relied were not applicable to Swann's trespass claim, *id.* at 10–13.  The Court dismissed Plaintiffs' claim for intentional infliction of emotional distress with leave to amend, *id.* at 13–17, but Plaintiffs did not file a second amended complaint to pursue that claim.

### 3.    Parties' Arguments

Defendants contend they are entitled to summary judgment on Plaintiffs' First Amendment retaliation claim because there was probable cause to revoke the permits, which precludes any subjective inquiry into Defendants' actual motive.  Mot. (dkt. 81) at 13–14.  Plaintiffs contend that

8

1     they can rely on an exception to that rule for circumstances where enforcement action is not

2     typically taken despite probable cause. Opp'n (dkt. 91) at 10–11. Defendants respond that

3     Plaintiffs have not presented objective evidence of a lack of enforcement under comparable

4     circumstances. Reply (dkt. 93) at 2.

5          Defendants argue that there is no evidence that either Hernandez or Sweeney was aware of

6     Richards's speech critical of DBI at the time the permits were revoked, and that even if Sweeney

7     was aware of it, the decision to revoke the permits was made solely by Hernandez. Mot. at 14–17;

8     Reply at 3–8. Plaintiffs argue that Sweeney was involved in the decision to revoke the permits,

9     and that circumstantial evidence can support an inference that Sweeney and Hernandez knew of

10    Richards's criticism of DBI and calls for stricter enforcement. Opp'n at 12–17. Defendants

11    contend that at the very least they are entitled to qualified immunity, Mot. at 18–20, while

12    Plaintiffs argue that the law against official retaliation for speech is clear, Opp'n at 17–18.

13         Defendants also argue that res judicata bars Plaintiffs' claim, because they asserted the

14    same primary right before the Board of Appeals and have not sought judicial review of that

15    administrative body's decision reinstating the permits on the condition that Plaintiffs cancel them.

16    Mot. at 20–22. Plaintiffs contend that res judicata does not apply because, among other reasons,

17    they prevailed at the Board of Appeals and it lacked authority to impose the damages they seek

18    here. Opp'n at 19–20.

19         Defendants seek summary judgment on Swann's Fourth and Fourteenth Amendment

20    claims, which Plaintiffs do not oppose (at least as to the Fourth Amendment claim; their

21    opposition brief does not specifically address the Fourteenth Amendment claim). Mot. at 22–23;

22    Opp'n at 20. Defendants ask the Court to decline to exercise supplemental jurisdiction over

23    Swann's claim for trespass if the Court grants judgment on all federal claims, but they do not seek

24    summary judgment on the merits of that claim. Mot. at 23–24.

25         **B.     Analysis**

26              **1.      Legal Standard Under Rule 56**

27         Summary judgment on a claim or defense is appropriate "if the movant shows that there is

28    no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

United States District Court
Northern District of California

United States District Court
Northern District of California

1    law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

2    the absence of a genuine issue of material fact with respect to an essential element of the non-

3    moving party's claim, or to a defense on which the non-moving party will bear the burden of

4    persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

5         Once the movant has made this showing, the burden then shifts to the party opposing

6    summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.*

7    (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

8    disputed must support the assertion by . . . citing to particular parts of materials in the record

9    . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

10   substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v.*

11   *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of

12   identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan*

13   *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the

14   record in search of a genuine issue of triable fact.'"  *Id.* (citation omitted); *see Carmen v. S.F.*

15   *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

16        A party need not present evidence to support or oppose a motion for summary judgment in

17   a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

18   to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.

19   2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

20   are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co.,*

21   *Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all

22   reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

23   (2007), but where a rational trier of fact could not find for the non-moving party based on the

24   record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

25   *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

26        **2.    Swann's Fourth and Fourteenth Amendment Claims**

27        Defendants move for summary judgment on Swann's § 1983 claim under the Fourth and

28   Fourteenth Amendments because, among other reasons, Plaintiffs have not shown that the only

United States District Court
Northern District of California

defendants named in this claim—Sweeney and Hernandez—caused the non-party fire inspector to enter the property at issue, a different building from the Six Dogs Property at issue in the First Amendment claims.  Mot. at 23.  Plaintiffs respond as follows, without specifically addressing the Fourteenth Amendment claim:

> Because the focus of this case is on the retaliatory revocations, and because the damages stemming from the City's other retaliatory actions are recoverable under the First Amendment claim, Swann agrees not to pursue her Fourth Amendment claim.

Opp'n at 20.

Based on the lack of evidence that Sweeney or Hernandez played any role in the conduct underlying Swann's Fourth and Fourteenth Amendment claims, Defendants' motion for summary judgment is GRANTED as to those claims.

### 3.    Overview of First Amendment Retaliation

Plaintiffs' sole remaining federal claim under § 1983 is for retaliation in violation of the First Amendment.

> The First Amendment forbids government officials from retaliating against individuals for speaking out.  To recover under § 1983 for such retaliation, a plaintiff must prove:  (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.

*Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (cleaned up; footnote omitted).

In the case of an arrest, Supreme Court precedent requires a § 1983 plaintiff to make a threshold showing either that the officer lacked probable cause or that the circumstances are such that despite probable cause to arrest, officers "typically exercise their discretion not to do so." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019).  The parties here do not dispute that the *Nieves* standard applies to the administrative enforcement action at issue.  If a plaintiff shows either the absence of probable cause or that enforcement action is not typically taken in similar circumstances, "then the *Mt. Healthy*[7] test governs: The plaintiff must show that the retaliation

---

[7] *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 279 (1977).

was a substantial or motivating factor behind the [official conduct], and, if that showing is made, the defendant can prevail only by showing that the [official conduct] would have been initiated without respect to retaliation." *See id.* at 1725 (citations omitted).

For the purpose of the present motion, the parties dispute only the threshold question of probable cause and the element of causation.

### 4. Res Judicata

Before turning to the merits of Plaintiffs' First Amendment claim, the Court addresses Defendants' argument that it is barred by res judicata due to the Board of Appeals resolution of Plaintiffs' administrative challenge to their permit revocations. As a general rule, "[r]es judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action . . . whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (citation and internal quotation marks omitted). Federal courts "give preclusive effect to a [California] state administrative decision if the California courts would do so." *Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147, 1155 (9th Cir. 2018).

Defendants contend that California courts would give preclusive effect to the final decision of the Board of Appeals on Plaintiffs' challenge to the revocation of their permits, and this Court should therefore do so as well. Mot. at 20–22. Plaintiffs argue that they are not required to exhaust administrative remedies to bring a § 1983 claim, that they prevailed before the Board of Appeals, and that the Board of Appeals lacked authority to award damages. Opp'n at 19–20.

Both parties' arguments miss the mark, as neither addresses the rule that "the claim preclusion inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement." *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2019) (citation and internal quotation marks omitted). Courts then "look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than to general principles of claim preclusion," and apply the terms of the release included in the settlement agreement. *Id.* Courts "are not at

United States District Court
Northern District of California

liberty to give [a settlement] agreement greater preclusive effect than the parties intended," even when judgment is entered in accordance with that agreement.  *Id.* at 691.

The Board of Appeals decision specifically states that it was based on "the agreement of the parties."  Stevens Decl. Ex. U.  There is no indication that, as part of that agreement, the parties intended to preclude Plaintiffs' claim for damages in this Court.  Given that the parties reached their agreement to resolve the administrative appeal while this case was pending, the Court would expect any agreement to resolve this action as well to be explicit.  The fact that this case was not voluntarily dismissed more than a year ago when the parties agreed to resolve the administrative proceedings tends to suggest that they did not also agree to resolve this case.  Nor is a desire to resolve those administrative proceedings and move forward on the project, even by canceling the permits at issue and seeking new permits, incompatible with Plaintiffs' claim here that the permits would not have been revoked but for Richards's protected speech and that they are entitled to damages on that basis.  The Court therefore concludes that Plaintiffs' claim is not barred by res judicata.

### 5.      **Cause to Revoke**

Defendants contend that they cannot be liable for retaliation under § 1983 because there was sufficient cause to revoke the permits.  Neither party disputes that the causation standard of *Nieves*, which specifically addresses arrests rather than revocation of permits, applies to this case.  *See* Mot. at 13–14; Opp'n at 10–11.[8]  That case held that a plaintiff must generally show lack of probable cause for an arrest, but recognized an exception for crimes not typically enforced by arrest:

> Although probable cause should generally defeat a retaliatory arrest
> claim, a narrow qualification is warranted for circumstances where
> officers have probable cause to make arrests, but typically exercise

---

[8] Defendants assert in a footnote that the applicability of that standard to administrative enforcement proceedings is presently before the Ninth Circuit.  Mot. at 13 n.1 (citing County Defs.' Answering Br., *Autotek, Inc. v County of Sacramento*, No. 20-16599, ECF Doc. No. 27, 2021 WL 3264370 (9th Cir. July 26, 2021).  Based on a recently filed reply brief, that issue does not appear to be in dispute in that case, where the plaintiff argues that the defendants lacked authority to impose the particular penalty at issue and lacked probable cause.  Reply Br. at 12–14, *Autotek*, ECF Doc. No. 46 (9th Cir. Sept. 30, 2021).  Regardless, no party here argues that the *Nieves* standard does not apply, and no reason is apparent why it would not.

13

their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech.

. . .

For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case, because probable cause does little to prove or disprove the causal connection between animus and injury, applying *Hartman*'s[9] rule would come at the expense of *Hartman*'s logic.

For those reasons, we conclude that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. *Cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996). That showing addresses *Hartman*'s causal concern by helping to establish that "non-retaliatory grounds [we]re in fact insufficient to provoke the adverse consequences." 547 U.S. at 256. And like a probable cause analysis, it provides an objective inquiry that avoids the significant problems that would arise from reviewing police conduct under a purely subjective standard. Because this inquiry is objective, the statements and motivations of the particular arresting officer are irrelevant at this stage. After making the required showing, the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (brackets in original) (cleaned up). There is no indication from the *Nieves* opinion that the plaintiff introduced any evidence that arrests were unusual in similar circumstances,[10] and the Court therefore reversed the Ninth Circuit's decision that the defendants were not entitled to summary judgment, holding that the defendant officers' probable cause to support an arrest was sufficient to defeat the plaintiff's First Amendment retaliation claim. *See id.* at 1727–28.

The *Nieves* majority opinion did not delve into what sort of evidence would be necessary

---

[9] *Hartman v. Moore*, 547 U.S. 250 (2006).

[10] In reversing summary judgment for the defendants, the Ninth Circuit had relied solely on one officer's purported statement, "bet you wish you would have talked to me now," which at most implied that officer's subjective intent, not how similar circumstances were typically handled. *See Bartlett v. Nieves*, 712 F. App'x 613, 616 (9th Cir. 2017), *rev'd*, 139 S. Ct. 1715 (2019).

United States District Court
Northern District of California

to show that similar conduct did not typically result in arrest when the perpetrator had not engaged in the same sort of protected speech.  Defendants here contend that Plaintiffs must identify specific similarly situated projects where permits were not canceled.  Reply at 2.  But it is not clear that *Nieves* requires that particular form of evidence, and at least one justice did not understand it as such.  In a separate opinion, Justice Gorsuch addressed the issue as follows:

> Dissenting, Justice SOTOMAYOR reads the majority opinion as adopting a rigid rule (more rigid, in fact, than *Armstrong*'s) that First Amendment retaliatory arrest plaintiffs who can't prove the absence of probable cause must produce "comparison-based evidence" in every case. But I do not understand the majority as going that far. The only citation the majority offers in support of its new standard is *Armstrong*, which expressly left open the possibility that other kinds of evidence, such as admissions, might be enough to allow a claim to proceed. Given that, I retain hope that lower courts will apply today's decision "commonsensically," and with sensitivity to the competing arguments about whether and how *Armstrong* might apply in the arrest setting.

*Nieves*, 139 S. Ct. at 1734 (Gorsuch, J., concurring in part and dissenting in part) (citations omitted).

Here, Plaintiffs rely in part on testimony by Sweeney and Hernandez indicating that the permit violations at issue would not in themselves have supported the relatively drastic remedy of revocation absent Sweeney and Hernandez's stated justification of Buscovich's purported unwillingness to cooperate.  *See* Emblidge Decl. Ex. D (Sweeney Dep. I) at 35:1–6 (responding to a question about other reasons for revocation: "No.  I wouldn't have revoked the permits, it was only because he stated he wasn't going to cooperate and they were selling the building."); *id.* at 40:24–41:1 ("The decision to revoke the permit really has nothing to do with the work done there, it was their agent being uncooperative."); *id.* at 41:24–42:2 ("Q. . . . Did you think the complaints about the Six Dogs project and the work that was done there justified revocation?  A. No, it was the poor attitude of the agent."); *id.* at 68; Emblidge Decl. Ex. V (Hernandez Dep.) at 110:24–111:4 (agreeing with Sweeney's testimony that the work performed did not justify revocation, which was based instead on Buscovich's purported conduct).[11]

_____

[11] The Court assumes for the sake of argument that Sweeney and Hernandez's stated reason for

1        DBI's Interim Director Patrick O'Riordan described permit revocation as, in his view, "a

2   nuclear button" that he did not typically use when he could find other ways to ensure compliance.

3   Emblidge Decl. Ex. C (O'Riordan Dep.) at 105:10–17.  He testified that DBI typically revokes

4   only around twelve permits per year, more than half of which stem from a request by the Planning

5   Department rather than unilateral action by DBI.  *Id.* at 100:14–24.  Buscovich, who has dealt

6   professionally with DBI for "decades," states that "permit revocation is a very rare and extreme

7   action."  Buscovich Decl. ¶ 15.  Buscovich also states that the identified violations were "minor

8   and properly correctable via a revision permit," which is "what normally occurs in these

9   circumstances."  *Id.* ¶ 7.

10       On their own, Sweeney and Hernandez's subjective reasons for revoking the permits are

11  likely insufficient to meet Plaintiffs' threshold burden under *Nieves*.  *See* 139 S. Ct. at 1727

12  (rejecting the approach of "reviewing police conduct under a purely subjective standard").  As

13  senior DBI enforcement officials, however, their views that the permit violations at issue here

14  were not sufficient in themselves to revoke the permits, taken together with O'Riordan's view that

15  revocation is a "nuclear" option, the rarity with which it is used unilaterally by DBI, and

16  Buscovich's experience that revocation is unusual and would not normally be warranted for the

17  sort of violations identified at the Six Dogs Property, could support a reasonable inference that,

18  even if DBI had sufficient legal cause to revoke the permits, its officers "typically exercise their

19  discretion not to do so" under similar circumstances.  *See Nieves*, 139 S. Ct. at 1727.

20       *Nieves* does not clearly require specific evidence of particular comparable circumstances

21  where official action was not taken.[12]  To the extent it could be read as imposing such a

22  _____

23  revoking the permits—Buscovich's purported refusal to cooperate—could be a valid and
    nonretaliatory reason for revocation if a jury credits it.  If a jury instead credits Buscovich and

24  Lopez's testimony about the meeting at issue, however, it could reasonably conclude that
    Buscovich was cooperative, Sweeney and Hernandez's testimony to the contrary is false, and they

25  lacked probable cause to revoke permits on that basis.  For purposes of summary judgment, of
    course, the Court must draw all reasonable inferences in favor of the moving party.  Here, that

26  includes an inference the stated reason for revoking the permits was false because Buscovich was
    cooperative at the meeting.  The Court's analysis therefore focuses on whether the permit

27  violations themselves, which Plaintiffs do not dispute at least for the purpose of the present
    motion, provide sufficient grounds for revocation to insulate that action from review under *Nieves*.

28  [12] Plaintiffs have identified some projects by Rodrigo Santos and John Pollard where work was

United States District Court
Northern District of California

requirement it would be dicta—again, there is no indication that the plaintiff in that case presented *any* evidence that arrests were unusual under similar circumstances.  In this Court's view, the sort of evidence presented here both implicates *Nieves*'s concern that "an unyielding requirement to show the absence of probable cause could pose a risk that some . . . officers may exploit [their official authority] as a means of suppressing speech," and is enough to overcome that decision's countervailing concern regarding risks of endless and "broad-ranging discovery" arising from the fact that subjective "state of mind is easy to allege and hard to disprove."  *See id.* at 1725, 1727 (cleaned up).  Defendants are not entitled to summary judgment under that standard.

### 6.    Sweeney's Involvement

Defendants contend that Plaintiffs cannot show that Sweeney, as opposed to Hernandez, was responsible for the revocation of Plaintiffs' permits.

At his deposition, Hernandez described his role in revoking the permits as making a recommendation that Sweeney accepted:

> . . . I think we tried to keep calm and, you know, after there was no agreement I know that Mr. Sweeney asked me what was my recommendation and I said, well, on this case, if Mr. Buscovich is not going to work with us, and if he feels that it's a minor issue, then I feel revoking the permits will be the right idea to start all over again with a new set of permits.
>
> Q. What did Mr. Sweeney say?
>
> A. He is my deputy director, he backed me up.
>
> Q. What did he say?
>
> A. He said okay, if that's the case, then okay.

Emblidge Decl. Ex. V (Hernandez Dep.) at 56:12–23.

Buscovich's deposition testimony frames the exchange somewhat differently, but also has

performed outside the scope of permits but the permits were not revoked.  *See* Opp'n at 4–5.  It is not clear there is sufficient evidence to determine whether those violations were comparable to the violations at the Six Dogs Property, or whether the failure to revoke permits in those particular cases represented a "typical" approach rather than favoritism for the individuals at issue.  Because the Court holds that Plaintiffs can meet their burden to show that permits would not typically be revoked for the type of violations found at the Six Dogs Property without direct evidence of particular comparable violators, the Court need not resolve whether Plaintiffs' evidence meets that narrower standard.

Sweeney playing a role in the decision to revoke the permits, in that Sweeney asked Hernandez how other projects with similar violations had been treated, Hernandez identified a project where permits had been revoked, and Sweeney responded, "well, I think you have your answer."  Wang Decl. (dkt. 93-1) Ex. X (Buscovich Dep.) at 103:13–21; *see also id.* at 111:19–25.

Buscovich also states that Sweeney told him he "would enjoy screwing with [him] as a bonus secondary target to Mr. Richards" and "as payback" for Buscovich complaining about DBI's practices, further suggesting that Sweeney was involved with the decision.  Buscovich Decl. ¶ 14.  Defendants ask the Court to exclude that portion of Buscovich's declaration as a sham under *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012), because Buscovich did not mention that purported comment by Sweeney in his deposition testimony or in a declaration submitted in administrative proceedings.  Reply at 12.

In *Yeager*, the Ninth Circuit explained the "sham affidavit" rule as follows:

> "'The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.'" *Van Asdale* [v. *Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)] (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). This sham affidavit rule prevents "a party who has been examined at length on deposition" from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony," which "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy*, 952 F.2d at 266 (internal quotation marks omitted); *see also Van Asdale*, 577 F.3d at 998 (stating that some form of the sham affidavit rule is necessary to maintain the principle that summary judgment is an integral part of the federal rules). But the sham affidavit rule "'should be applied with caution'" because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment. *Id.* (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993)). In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998–99.

*Yeager*, 693 F.3d at 1080.

The fact that Buscovich did not address Sweeney's purported comment at his deposition or in a prior declaration is not in itself the sort of "clear and unambiguous" contradiction necessary to invoke the sham affidavit rule.  Defendants have not identified any testimony that contradicts

United States District Court
Northern District of California

Buscovich's declaration, nor even a question he was asked where the purported comment would have been relevant to his answer.  While Buscovich's failure to address that comment earlier might be a subject for cross-examination at trial, it is not grounds to strike the declaration as a sham, and the declaration remains relevant evidence for the purpose of the present motion.

Taking into account Buscovich and Hernandez's testimony about Sweeney's role at the September 30, 2019 meeting, as well as Buscovich's declaration regarding Sweeney's assertion of a retaliatory motive, a jury could conclude that Sweeney played a role in the decision to revoke the permits.  There is also evidence that Hernandez was responsible: the fact that Hernandez actually signed the revocation, Buscovich's testimony that Hernandez indicated his intent to revoke the permits at the inspection a few days earlier, and Sweeney's deposition testimony, at least some of which attributes the decision to Hernandez.  But resolving those conflicts is the role of a jury at trial, not the Court on summary judgment.  Defendants are not entitled to summary judgment based on a lack of involvement by Sweeney.

### 7.    Retaliatory Motive

Defendants contend that no jury could find that Sweeney and especially Hernandez were motived by retaliatory animus because there is no evidence that either of them knew of Richards's protected speech at the time the permits were revoked.  Defendants are correct that there is little if any direct evidence of such knowledge, and that Hernandez denied knowing of Richards's criticism before the Board of Appeals hearing some time after the permits were revoked.  A jury is not required to credit Hernandez's testimony, however, and there is circumstantial evidence that could support an inference to the contrary.

The record tends to suggest that Sweeney was friendly, or at least in relatively frequent contact with, a number of people who were either targets of Richards's criticism or had themselves criticized Richards's approach to oversight, including Santos, Pollard, DBI official Curran (who reported to him), and RBA president Keighran.[13]  He spoke with a number of such people by

---

[13] Courts in some circumstances have permitted inferences of a defendant's knowledge based on the defendant's frequent conversations with others who had such knowledge.  *See, e.g.*, *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F. Supp. 3d 1039, 1061–62 (D. Or. 2013).

United States District Court
Northern District of California

telephone in the days leading up to the revocation.  Although he was not able to recall the subject of those telephone calls and it is plausible that they concerned unrelated subject matter, Sweeney's contact with those individuals is a plausible means by which he could have learned of Richards's advocacy even if Sweeney himself never spoke to Richards or attended a Planning Commission meeting.  Darryl Honda's testimony regarding gossip as to Richards's purported hypocrisy also suggests that Richards's advocacy for stricter oversight was common knowledge in the building industry and its local regulators.  *See* Emblidge Decl. Ex. N (Honda Dep.) at 121:16–122:3.  A jury might expect that Hernandez would be exposed to the same gossip, or at least could have learned about Richards's reputation through Sweeney.  Moreover, both Sweeney and Hernandez were senior officials at DBI at the time, and a jury might reasonably infer that they would likely have known of a planning commissioner's criticism of DBI at the July hearing where Curran was called to answer for DBI's failure to identify violations.

Hernandez testified that he did not recall even knowing that Richards was involved with the Six Dogs Property until the September 30, 2019 meeting, but Sweeney testified that he discussed the forthcoming complaint against Richards in a senior staff meeting where Hernandez was present before the formal complaint was lodged.  A jury might find implausible that after Sweeney found it relevant to discuss an upcoming complaint against Richards due to his status as a commissioner before the complaint was filed, he would not mention it again when the complaint was actually filed and he handed it off to Hernandez, or that Hernandez would not have connected Sweeney's description of the expected complaint to the actual complaint that Hernandez received from Sweeney.  Discrepancies between Sweeney's and Hernandez's versions of how the complaint was assigned to Hernandez—with Sweeney testifying that Hernandez happened to be present in O'Riordan's office and volunteered for it, while Hernandez testified that Sweeney called him into his office and gave it to him—might also call into question both of their testimony as to what they discussed at that time.

As discussed above, a jury that credited Buscovich and Lopez's description of the September 30, 2019 meeting might conclude that Buscovich did not express any opposition to cooperating to resolve the issues, and thus conclude that Sweeney and Hernandez's explanation

for revoking the permits on that basis was false.  Taking into account Sweeney and Hernandez's testimony that they did not believe the permit violations themselves warranted revocation, the lack of any other substantiated explanation for that unusual approach to enforcement—again, assuming the jury does not credit testimony that Buscovich was combative and refused to cooperate—could support an inference that the stated basis for revocation was pretext.  Buscovich's assertion that Sweeney pulled him aside at the end of the meeting and clearly expressed a retaliatory motive, at least towards Buscovich as a "secondary target" to Sweeney, is also evidence that a jury is entitled to consider.

The evidence is far from clear in this case, and a jury could reach any number of conclusions as to why the permits were revoked.  But there are several relevant facts that, taken together, might tend to support an inference that Sweeney and Hernandez were aware of Richards's criticism of DBI's enforcement practices and revoked Six Dogs' permits on that basis: Sweeney's friendship and frequent communications with targets of Richards's criticism; Sweeney and Hernandez's senior roles at DBI and Sweeney's role supervising Curran, who testified at one of the Planning Commission hearings at issue; discrepancies between Sweeney, Hernandez, and O'Riordan's testimony about how the complaint was initially assigned to Hernandez; discrepancies between Sweeney, Hernandez, Buscovich, and Lopez's testimony about the meeting at which the permits were revoked; the disconnect between Sweeney and Hernandez's stated reason for revoking the permits (Buscovich's noncooperation) and Buscovich and Lopez's testimony that Buscovich was cooperative; and Sweeney's purported statement to Buscovich that he would enjoy punishing Buscovich for his criticism of DBI and considered him a "secondary target" to Sweeney.  It is unlikely that any one of those facts, standing alone, would be sufficient to show Sweeney and Hernandez's knowledge of Richards's speech and intent to retaliate against it.  But the Court is not prepared to say that no reasonable jury could infer from this record as a whole that the revocation was based on Sweeney and Hernandez's retaliation for Richards's advocacy for stricter oversight and perceived criticism of DBI.

### 8. Defendants Are Not Entitled to Qualified Immunity

The doctrine of qualified immunity protects government officials performing discretionary

1    functions "from liability for civil damages insofar as their conduct does not violate clearly

2    established statutory or constitutional rights of which a reasonable person would have known."

3    *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The salient question is whether the state of the

4    law at the time of an incident provided fair warning to the defendants that their alleged conduct

5    was unconstitutional."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (cleaned up).  The qualified

6    immunity inquiry does not alter the general rule on summary judgment that factual disputes and

7    reasonable inferences must be resolved in favor of the non-moving party.  *See id.* at 657–60.

8          That government officials cannot use their official authority to retaliate against protected

9    speech is clearly established.  Under longstanding Supreme Court precedent, "the law is settled

10   that as a general matter the First Amendment prohibits government officials from subjecting an

11   individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256

12   (2006).  *Nieves* clearly established that even where officers have probable cause for their

13   retaliatory conduct, the prohibition applies if their conduct would be an atypical exercise of

14   discretion in the absence of the protected speech that is the subject of retaliation.  *Nieves*, 139 S.

15   Ct. at 1727.  Courts have routinely applied the rule against retaliation to cases involving

16   government permitting decisions.  *See, e.g.*, *Carpinteria Valley Farms, Ltd. v. County of Santa*

17   *Barbara*, 344 F.3d 822, 830 (9th Cir. 2003) (allowing a First Amendment retaliation claim based

18   on "requirements, conditions, delays and fees" imposed for building and other land use permits).

19         Defendants are correct that, as a general rule, "'clearly established law' should not be

20   defined 'at a high level of generality'" for the purpose of qualified immunity.  *See White v. Pauly*,

21   137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

22   Nevertheless, general rules can be sufficient to overcome qualified immunity in an "obvious case."

23   *See id.*; *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam).  Defendants have offered no

24   possible reason why, if a jury determines that Sweeney and Hernandez subjectively intended to

25   retaliate for Richards's oversight advocacy and that the violations at issue would not normally lead

26   to revocation of permits, a reasonable building enforcement officer might think those

27   circumstances were an exception to the general rules against retaliation for speech.  Defendants

28   are not entitled to qualified immunity here.

22

1 | **III.    MOTION TO EXCLUDE EXPERT TESTIMONY**

2 |     **A.    Background**

3 |       Plaintiff's expert witness David Parry has been a real estate broker in San Francisco for

4 | more than thirty years.  Mot. to Exclude (dkt. 80) Ex. B (Parry Report) at 1.  He states in his three-

5 | page report that he reviewed the pleadings and deposition testimony in this case as well as some

6 | related press coverage, and researched sales for tenancy-in-common ("TIC") units and

7 | condominiums in 2019 and 2020.  *Id.* at 1–2.  He presents the following conclusions: (1) the San

8 | Francisco real estate market was at an all-time high in September of 2019; (2) sales expectations

9 | were strong at that time, consistent with the market's usual pattern of a fall peak; (3) the four TIC

10 | units at the Six Dogs Property "are of an unusually fine quality, in a building that has been

11 | significantly retrofitted and updated for modern living," with generous parking spaces; (4) all four

12 | units "would have sold in the Fall of 2019 if the customary way of closing out existing building

13 | permits, while obtaining a revision permit for the additional necessary corrective work discovered

14 | during construction performed, had been followed"; (5) the units would have sold at that time for

15 | $1,700,000, $1,975,000, $1,950,000, and $1,675,000 respectively, for a total value of $7,300,000;

16 | (6) it was appropriate for Plaintiffs to take the units off the market after DBI identified violations

17 | and a building inspector attended their open house to warn potential buyers; (7) the estimated

18 | rental value is $7,500 per month for the three-bedroom units and $6,000 per month for the two-

19 | bedroom units, which supports Parry's overall valuation of the property; and (8) Plaintiffs'

20 | damages based on their actual sale prices (and an estimated price for the one unit that had not sold

21 | at the time of his report) are $910,000, plus additional costs incurred.  *Id.* at 2–3.

22 |       Relying on a declaration by their own expert Tom Fernwood, a certified real estate

23 | appraiser, Defendants move to exclude Parry's opinions on the grounds that he is not qualified to

24 | conduct real estate appraisals, Mot. to Exclude at 3, has presented no relevant experience as to

25 | how permits are handled, *id.*, did not use the generally accepted methodology of appraisers, *id.* at

26 | 3–4, improperly considered sales in "District 5,"[14] the Noe Valley neighborhood, rather than

27 | —————————————

28 | [14] Fernwood asserts in his declaration that he relies on a district map published by Plaintiff

United States District Court
Northern District of California

United States District Court
Northern District of California

"District 9," the Mission neighborhood, *id.* at 4, improperly considered condominiums as comparable properties rather than focusing on TIC units, *id.* at 4–5, failed to address the square footage of the Six Dogs TIC units, *id.* at 2, and failed to provide any basis for his rental estimates or his opinion that the properties would have sold in the fall of 2019 but for Defendants' permit revocations, *id.* at 5–6.

Plaintiffs argue that Parry's experience as a real estate broker is more relevant to estimating a "real world" sale price than a formal appraisal would be, and that courts have allowed brokers to offer expert opinions in similar circumstances. Opp'n to Mot. Exclude (dkt. 90) at 2–4. Plaintiffs contend that Parry's methodology (relying on market trends, other sales, and his own experience) is consistent with his field, and assert that his characterization of the Six Dogs Property as located in the Noe Valley neighborhood and District 5 was correct and consistent with sale reports for the TIC units. *Id.* at 4–5 & n.3. Plaintiffs do not specifically address Parry's opinion regarding potential rental value.

Defendants respond in their reply that because Parry relies in part on sales of other properties, he improperly "seeks to give the jury the impression that he is using an appraisal methodology," and this Court should follow a 1992 decision by a Maryland bankruptcy court holding that brokers who are not trained as appraisers cannot testify regarding fair market value. Reply re Mot. to Exclude (dkt. 92) at 1–2 (citing *In re Donoway*, 139 B.R. 156, 158 (Bankr. D. Md. 1992)). Defendants note that courts have recognized that the appraisal method of "the 'sales comparison approach' is 'the preferred means of determining real property value.'" *Id.* at 2 (quoting *Feduniak v. Old Republic Nat'l Title Co.*, No. 13-cv- 02060-BLF, 2015 WL 1969369, at *2 (N.D. Cal. May 1, 2015)). Defendants argue again that Parry considered insufficient information about purportedly comparable properties and that the appropriate neighborhood for comparison is the Mission district, and contend that at the very least the property is on the border of the Mission and Noe Valley and would require consideration of sales in both neighborhoods.

---

Swann's brokerage, purportedly attached to his declaration as Exhibit B. Fernwood Decl. (dkt. 80-4) ¶ 4. The documents actually attached as Exhibit B are property listings for a TIC unit and two condominiums, which Fernwood's declaration references as Exhibit C. The districts Fernwood describes appear to refer to MLS real estate districts.

1    *Id.* at 3–4.

2        **B.    Legal Standard**

3        Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness

4    who is qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R.

5    Evid. 702.  This rule embodies a "relaxation of the usual requirement of firsthand knowledge,"

6    *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993), and requires that certain

7    criteria be met before expert testimony is admissible.  The rule sets forth four elements, allowing

8    such testimony only if:

9            (a) the expert's scientific, technical, or other specialized knowledge
             will help the trier of fact to understand the evidence or determine a
10           fact in issue;

11           (b) the testimony is based on sufficient facts or data;

12           (c) the testimony is the product of reliable principles and methods;
             and
13

14           (d) the expert has reliably applied the principles and methods to the
             facts of the case.

15   Fed. R. Evid. 702.  These criteria can be distilled to two overarching considerations: "reliability

16   and relevance."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  The inquiry

17   does not, however, "require a court to admit or exclude evidence based on its persuasiveness."  *Id.*

18       The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science,"

19   and grants the court "broad latitude not only in determining whether an expert's testimony is

20   reliable, but also in deciding how to determine the testimony's reliability."  *Id.* (citing *Kumho Tire

21   Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)).  Evidence should be excluded as

22   unreliable if it "suffer[s] from serious methodological flaws."  *Obrey v. Johnson*, 400 F.3d 691,

23   696 (9th Cir. 2005).

24       The relevance prong looks to whether the evidence "fits" the issues to be decided:

25   "scientific validity for one purpose is not necessarily scientific validity for other, unrelated

26   purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant."

27   *Daubert*, 509 U.S. at 591.

28

United States District Court
Northern District of California

**C.    Analysis**

Not all expert testimony requires adherence to a strict methodology.  The Supreme Court has acknowledged that the that "the factors identified in *Daubert*"—considerations like testing, peer review, and controlling standards—"may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (cleaned up).  The Court cited with approval a brief by the United States listing "land valuation" as among the categories of expert testimony where considerations relevant to *scientific* experts might not be appropriate.  *Id.*

Parry asserts in his report that he routinely provides clients and other brokers with opinions as to what a property is worth.  Parry Report at 1.  One role of a real estate broker is to provide such opinions based on market trends and past experience.  The only case that Defendants cite excluding such opinions is the Bankruptcy Court's decision in *Donaway*, which cites no authority for its conclusion.  139 B.R. at 158.  *Donaway* in fact predates *Daubert* and all subsequent authority interpreting that decision's seminal discussion of the modern standard for admitting expert testimony.  Other cases Defendants cite are distinguishable.  *See Feduniak*, 2015 WL 1969369, at *2 (excluding real estate valuation opinions offered in an insurance case by a "certified public accountant and a chartered financial analyst" who had "no experience in the appraisal of real property"); *United States v. 12.94 Acres of Land in the Cty. of Solano*, No. CIV S-07-2172 FCD/EFB, 2009 WL 4828749, at *4 (E.D. Cal. Dec. 9, 2009) (excluding an appraiser's opinion that failed to account for "the requirements for valuing federally-condemned property," a niche field not at issue here).

This Court agrees instead with a Northern District of Alabama decision admitting similar testimony:

> . . . Ms. Dysart has shown that Mr. Long is a licensed real estate broker with extensive experience in the real estate market generally and extensive particular knowledge about the value of the homes in the subdivision where Ms. Dysart's home was located.
>
> The court finds that this experience and knowledge could help the jury understand the market value of Ms. Dysart's home based on sufficient facts and data. See Fed. R. Evid. 702. In other words, the court finds that Mr. Long can competently provide reliable testimony about the

United States District Court
Northern District of California

1

2

3

> market value of Ms. Dysart's home in a way that will assist the jury in determining the value of the home for damages purposes, as Mr. Long can base his testimony on his extensive personal knowledge and experience. *See . . . Kumho Tire*, 526 U.S. at 150. So, the court finds that Ms. Dysart has shown that, pursuant to Rule 702 and Daubert and its progeny, the court should not exclude Mr. Long's testimony.

4   *Dysart v. Trustmark Nat'l Bank*, No. 2:13-CV-02092-KOB, 2020 WL 4815131, at *3–4 (N.D.

5   Ala. Aug. 19, 2020).

6         Although the defendant in *Dysart* did not dispute the witness's qualification under Rule

7   702, instead arguing only (and unsuccessfully) that he was barred from testifying under Alabama

8   law, the court's analysis of Rule 702, while brief, is persuasive.  Here, Parry's experience and

9   review of the market provides sufficient grounds to allow under Rule 702 his testimony regarding

10   a likely sale value in the fall of 2019 absent permit revocation, as well as testimony regarding the

11   wisdom of Plaintiffs' decision to take the property off the market in response to the revocation of

12   their permits.  Plaintiffs are also correct that California law allows a real estate broker to offer

13   expert testimony on the value of real estate.  *In re Marriage of Hokanson*, 68 Cal. App. 4th 987,

14   995–96 (1998).

15         That said, Defendants' arguments are persuasive as to two issues, which Plaintiffs do not

16   address in their opposition brief: Parry has not demonstrated any experience from which he could

17   assess "the customary way of closing out existing permits," and he has not provided any basis for

18   his estimates of potential rental income.  Defendants' motion is GRANTED as to those opinions.

19         Defendants remaining concerns—including which properties or neighborhoods provide the

20   best comparisons, how distinctions in size and form of ownership factor into value, and whether

21   Parry gathered enough information about other properties that he considered—are potentially

22   valid, but go to weight rather than admissibility.  The jury is capable of understanding and

23   assessing both sides' arguments on these points.[15]  The motion is DENIED as to Parry's remaining

24   opinions.

25

26   [15] One concern that Defendants have not addressed is that Parry's report includes no explanation of whether he ever visited the Six Dogs Property, or if not, what materials he relied on to form his

27   opinion of that property.  Since the issue was not raised in Defendants' motion, Plaintiffs had no reason to respond to it, and the Court declines to exclude Parry's opinions on that basis sua sponte.

28   As with the concerns Defendants actually raised, the jury can take into account any potential deficiencies in Parry's familiarity with the Six Dogs Property.

United States District Court
Northern District of California

1    **IV.    CONCLUSION**

2         If this case goes to trial, a jury will be faced with resolving incomplete and contradictory

3    evidence as to the reasons why Defendants revoked Plaintiffs' building permits.  Viewing the

4    record in the light most favorable to Defendants, a jury might conclude that Sweeney and

5    Hernandez were dedicated civil servants who, despite some lapses in procedure (and perhaps other

6    bad actors in their department), enforced the law without fear or favor for Richards's status as a

7    member of the Planning Commission.  Viewing the record in the light most favorable Plaintiffs,

8    however—as the Court must on summary judgment—a jury might conclude that Sweeney and

9    Hernandez used run-of-the-mill violations that would typically be resolved informally as pretext to

10   retaliate against Richards criticizing DBI and threatening more stringent oversight of their

11   department and their friends in the building industry.  Defendants' motion for summary judgment

12   is therefore DENIED as to retaliation claims based on the permit revocations and related conduct

13   (like a DBI inspector publicizing the revocations at an open house).  Defendants' motion is

14   GRANTED as to the Fourth and Fourteenth Amendment claims that Plaintiffs have declined to

15   pursue.  It is also GRANTED to the extent Plaintiffs base their First Amendment claim on

16   retaliatory conduct separate from the permit revocations and more closely related to their

17   abandoned Fourth and Fourteenth Amendment claims, like a burglary of Swann's office and a fire

18   inspector's entry to a building she owned, since Plaintiffs have submitted no evidence to support

19   an inference of retaliation as to that conduct.[16]

20        Since the only remaining federal claim does not meaningfully relate to the alleged trespass,

21   the Court exercises its discretion under 28 U.S.C. § 1367(c) to decline supplemental jurisdiction

22   over that state-law claim.  Swann's trespass claim is therefore DISMISSED, without prejudice to

23   her pursuing it in a court of competent jurisdiction.

24   / / /

25   / / /

26

27   [16] Such issues fall within the scope of Defendants' motion, which sought summary judgment on
     Plaintiffs' First Amendment retaliation claim in its entirety.  If Plaintiffs believed that claim could
28   proceed based on conduct other than the permit revocations, they should have presented argument
     and evidence to that effect.

United States District Court
Northern District of California

Finally, Defendants' motion to exclude expert testimony is GRANTED in part and DENIED for the reasons discussed above.

**IT IS SO ORDERED.**

Dated: November 19, 2021

JOSEPH C. SPERO
Chief Magistrate Judge